E-FILING   ADR

JONATHAN DAVIDSON, pro se
5675 Via Junipero Serra
Riverside, California 92506
Telephone: (858) 531-7578
Telefacsimile: (951) 823-0410
Email address: law.davidson@gmail.com

FILED

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

APR 12 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

|  |  |
|---|---|
| JONATHAN DAVIDSON, ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> HEWLETT-PACKARD COMPANY, ) <br> HEWLETT-PACKARD ) <br> ENTERPRISE, UNITED ) <br> HEALTHCARE, UNITED ) <br> HEALTHCARE SERVICES, INC., ) <br> UNITED HEALTH GROUP, ) <br> DR. ANGELIQUE GREEN, DR. PETER ) <br> STANGEL AND DR. EDWARD ) <br> GREENBERG, ) <br><br> Defendants ) | **COMPLAINT; JURY DEMAND** <br><br> Case No.: CV 16 1928 <br><br> NC |

Plaintiff Jonathan Davidson, pro se, as and for his Complaint, alleges as follows.

### A. PRELIMINARY STATEMENT

1. Jonathan Davidson is a husband, father and attorney who was diagnosed in 2009 with

a disabling neurodegenerative disease, amyotrophic lateral sclerosis (ALS), also known as Lou

Gehrig's disease. He is aware and perceptive, mentally sharp and high-functioning, but ALS has

caused him to lose the ability to move his muscles, and he must rely continually on breathing and

1

feeding tubes and trained and skilled healthcare professionals to survive. If he does not receive constant respiratory care, he could suffer respiratory failure within minutes and die.

2. Medical and healthcare and therapy for Jonathan Davidson ("Davidson" or the "Plaintiff") has been covered under health benefits medical plans for which defendants Hewlett-Packard Company and its affiliate Hewlett-Packard Enterprise (collectively and individually, "HP") have served as plan sponsor and plan administrator (any such plan, the "Medical Plan"). Defendants United Healthcare, United Healthcare Services, Inc., affiliates of United Health Group (each of the three individually and collectively, "UHC") have acted and served as claims administrators, service providers, administrators and/or trustees of the Medical Plan. Individual defendants Dr. Angelique Green, Dr. Peter Stangel and Dr. Edward Greenberg have acted and served as administrators, physicians, agents and principals in regard to health and medical care and therapy of Plaintiff Davidson and have worked with or for other Defendants (HP, UHC and such individuals, each individually a "Defendant" and collectively the "Defendants").

3. Despite Jonathan Davidson's disability and critical medical needs, Defendants have tried to deny that he requires any skilled medical care and have acted as though he does not have ALS disease. They attempted to impose a determination that his skilled care in a rehabilitation center should be terminated and that he needed only "custodial care" at home, which would not be covered and paid for under the Medical Plan. Jonathan has suffered irreversible damage due to the improper conduct of Defendants and the doctors and others who acted with them to wrongfully deny him care. The shocking and indefensible nature of the denial of care and other decisions and actions by Defendants is starkly obvious in light of reports from other physicians who have cared for Jonathan Davidson since his diagnosis with ALS in 2009. Upon information

and belief, Defendants must have been aware of the wrongful nature of their determinations and actions in regard to Davidson and the harm that would result.

4. Plaintiff Davidson has properly appealed the denials of care and has exhausted his internal administrative remedies in regard to the Defendants and the Medical Plan. In response to continued appeals and challenges made by the Jonathan Davidson and his wife Corinna, certain benefits and skilled care for Jonathan and his ALS disabilities have been provided, but the denial of care and manipulation of care determinations Defendants and their failure to follow procedures required for full and fair review of their wrongful denials of care have continued.

## B. THE PARTIES

5. Davidson is a resident of Riverside, California.

6. Defendant Hewlett-Packard Company is a corporation with a principal place of business in Palo Alto, California.

7. Defendant Hewlett-Packard Enterprise is a corporation with a principal place of business in Palo Alto, California. Upon information and belief, Hewlett-Packard Company and Hewlett-Packard Enterprise are affiliates and/or predecessors and/or successors to each other, following a recent corporate reorganization.

8. Defendant United Healthcare is a corporation with operations and a place of business in Santa Clara County, California, and with operations and a principal place of business in Utah.

9. Defendant United Healthcare Services, Inc. is a corporation with operations and a place of business in Santa Clara County and operations and a principal place of business in Salt Lake City, Utah.

10. Upon information and belief, Defendant United Healthcare group has a place of business and operations in Santa Clara County, California, and is a parent and/or affiliate of United Healthcare and United Healthcare Services, Inc.

11. Upon information and belief in regard to the individual Defendants, Plaintiff alleges:

(a) Angelique Green, MD, is a physician and Medical Director who works with or for UHC and other Defendants, with an office and residence in San Francisco, California;

(b) Peter Stangel, MD, is a physician who works with or for UHC and other Defendants and has an office and residence in New York, New York;

(c) Edward Greenberg, MD, is a physician who works with or for UHC and other Defendants and has an office and residence in Miami, Florida.

## C. JURISDICTION, VENUE AND INTRA-DISTRICT ASSIGNMENT

12. The Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1331 because a basis for the claims, demands, causes of action and remedies of Plaintiff against Defendants is the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. 1001 et seq. ("ERISA").

13. This Court has personal jurisdiction over all Defendants because Plaintiff's claims arise from each of Defendant's transacting business in the State of California, violating legal obligations and causing injury by an act or omission in the State of California, and/or violating legal obligations or causing injury in the State of California by an act or omission outside of the State of California.

14. Venue is proper in this district pursuant to 28 U.S.C. Section 1391(a)(2) in that a substantive part of the events, acts or omissions giving rise to the claims of Plaintiff occurred in this district.

15. This case is properly assigned to the San Jose Division of the Northern District because the claims arise in Santa Clara County, where HP and other Defendants have offices and/or conducted business and the acts or omissions alleged in this Complaint.

### D. CLAIMS

16. In deciding that Jonathan Davidson could be terminated from skilled care in a rehabilitation center, Defendants acted improperly, knowing that his medical condition and viability would decline precipitously, directly threatening his life. UHC Medical Director Angelique Green, MD, on February 12, 2015 seemed to ignore his ALS and asserted in regard to Jonathan, "You had a nerve problem. You had breathing trouble."

17. When the Davidsons appealed that ejection of Jonathan from skilled care, UHC relied on Doctor Peter Stangel to review and uphold Dr. Green's determination. Dr. Stangel declared in a February 26 decision, "You have no medical needs requiring inpatient skilled care." His assertion was made in spite of a February 23 letter from one of Jonathan's physicians, which stated: "Mr. Davidson requires continued care in a skilled nursing facility."

18. The February 12 and February 26 denials of care by Doctors Green and Stangel were reversed by UHC on appeal on March 5. However, in yet another UHC denial of care on April 10, 2015, Doctor Stangel revived his discredited position in order to uphold an April 2 denial of benefits by Dr. Green. Dr. Stangel stated about Jonathan in that April 10 adverse determination: "We do not see that you have skilled medical needs."

5

19. The shocking and indefensible nature of these denial of care decisions by Defendants is starkly obvious in light of reports from other physicians who have cared for Jonathan Davidson since his diagnosis with ALS in 2009. Letters from three of Jonathan's doctors dated April 29, May 1 and May 28, 2015 gave evidence of his condition and need for skilled medical care, contrary to the denials of care and affirmations on appeal by UHC on April 10, 2015. The notice of the affirmation of the denial of care in the April 10 UHC letter was received by Plaintiff no earlier than April 13, 2015.

20. In an April 29 letter from Dr. Laura Nist, a physician who has been involved with Jonathan's care since his ALS diagnosis in 2009, she describes his medical needs and the "complications" that would arise "if Jonathan were to receive care at home with non skilled providers." Dr. Nist, who is a neurologist and Director of an ALS clinic at a university hospital in California, reports in her April 29 letter:

> "The needs of an ALS patient with chronic neuromuscular respiratory failure and severe, generalized weakness include tracheostomy and ventilatory care, skin care and prevention of skin breakdown and ulcer formation, adequate GI [gastrointestinal] function and prevention of constipation and fecal impaction balanced with adequate nutritional intake, effective removal of urine without prolonged moisture on the skin and skin breakdown, and challenges with communication....Jonathan needs skilled medical care. The lack of skilled medical care puts Jonathan at risk for infection, aspiration pneumonia, skin breakdown, lack of response to potential cardiac and pulmonary events (as have occurred in the past), medication errors, and inadequate recognition of decline in health and rapid responsiveness to decline."

21. In their denials of Jonathan Davidson's critical needs, UnitedHealthcare and the its doctors and others working with or for UHC and HP tried to send Jonathan Davidson home for "custodial care" that does "not require special skills or training," effectively depriving him of the ongoing medical attention from physicians and other skilled and trained medical personnel that he needs to survive. Such "custodial care" would no doubt have saved money for the health

benefits plan administered by UHC and HP, because Defendants improperly asserted that custodial care was not covered by that plan.

22. Jonathan Davidson and his wife Corinna and five-year-old son Jake have been terribly damaged by the attempted denial of care by Defendants under the Medical Plan that covers the Davidsons. With round-the-clock efforts to handle and coordinate care for Jonathan, parenting for Jake and Corinna's financial support of her family as an employee at Hewlett-Packard, the Davidsons have fought to find means of balance and survival in their life in the years since Jonathan's diagnosis. Their chance for care and continuation of a family life together was shattered by the improper denial of medical care coverage by Defendants.

23. The conduct of Defendants UHC, HP and the Defendant doctors has been wrongful in their adverse benefits determinations and in their failure to follow proper procedures for full and fair review of those denials. The initial actions that were appealed by Jonathan Davidson as he exhausted his administrative remedies under the Medical Plan were improper, and subsequent actions by UHC and Defendants show a failure to follow proper procedures for full and fair review of those care denials.

24. UHC's February 12 and February 26, 2015 decisions to terminate and eject Jonathan Davidson from skilled care at the Reche Canyon Rehabilitation Center in California cannot be defended. His ALS disability and constant medical needs obviously justify "skilled care," which is described by UHC, in its adverse decisions, as services "delivered or supervised by licensed technical or professional medical personnel in order to obtain the specified medical outcome and provide for the safety of the patient." In contrast, the "custodial care" at home that UHC tried to force Jonathan into is described by UHC as "services that do not require special skills or

7

training" and that "do not require administration by trained medical personnel in order to be delivered safely and effectively."

25. In response to an appeal filed by the Davidsons, the adverse initial determination and the "first level" appeal decision by UHC and its doctors on February 12 and 26 were both overturned by a "second level" UHC appeal decision on March 5, 2015. That March 5 determination approving skilled medical care stated that it was valid through April 19, 2015.

26. In spite of that March 5 decision, UHC on April 2 issued an adverse determination in regard to another skilled care facility, Bridge 2 Life, to which the Davidsons wished to move Jonathan for improved care. The April 2 decision by UHC again attempted to call into question whether Jonathan would be covered for treatment with "Inpatient Services; Skilled Nursing Facility."

27. In response to an urgent appeal by the Davidsons on April 7 challenging the April 2 denial, UHC issued an adverse determination on April 9 that directly contradicted the long clinical record of Jonathan Davidson and also violated the March 5 reversal of UHC's February 12 and 26 denials of skilled care. Entirely overlooking the history of Jonathan Davidson's ALS disability and the March 5 determination, the April 9 "first level" appeal decision stated: "We did not receive any clinical information to show that you continue to need skilled nursing care."

28. In a "second level" appeal decision on April 10 affirming the first level denial issued the day before, Dr. Peter Stangel presented again his indefensible position that Jonathan did not have "skilled medical needs." Dr. Stangel added that "residential treatment is not a covered benefit, based on your health plan policy." UHC's April 10 denial went on to state that "custodial care" for Jonathan would not be covered by the Davidsons' benefit plan.

8

29. In addition to reviving the improper denial of "skilled care" for Jonathan that was overturned on March 5, the April 2, April 9 and April 10, 2015 adverse determinations by UHC incorrectly maintained that the Bridge 2 Life facility, where the Davidsons wished to move Jonathan for improved care, was a "congregate living facility" that was not a "covered benefit" under the Davidsons' health benefit plan. In fact, as shown in the attached Appeal Submission and Challenge brief, by March 27 Bridge 2 Life had submitted all documentation requested by UHC for approval of Bridge 2 Life as a "congregate living health facility" and "skilled nursing facility" regulated by the California Department of Public Health, rather than just a "congregate living facility."

30. UHC and its doctors and others failed to follow procedures for a full and fair review of the adverse benefit determinations that denied care and coverage to Jonathan under the Medical Plan covering the Davidsons.

31. The failure to allow full and fair review includes the following: (1) the issuance of adverse decisions denying Jonathan's right to skilled care on April 2, April 9 and April 10, 2015, in contradiction and violation of the prior March 5 UHC appeal decision, which approved skilled care for Jonathan through April 19; (2) decisions by UHC to affirm adverse determinations before the Davidsons had an opportunity to submit information and material appealing the determinations; (3) the immediate issuance by UHC of a "second level" appeal decision on April 10 affirming the "first level" appeal determination made by UHC on April 9, as well as other improper actions and decisions by UHC and its doctors that circumvented the health plan's two-level appeal process and cut off Jonathan Davidson's ability to submit written comments, documents, records and other information relating to his claims for benefits and related appeals; (4) failing to provide full and fair reviews that took into account all comments, documents,

records and other information submitted by Jonathan relating to his benefits claims and UHC's adverse determinations; and (5) improperly affording deference to initial adverse determinations and improperly allowing individuals involved in those adverse decisions to conduct review of the determinations.

32. Instances of such improper deference and conduct of reviews include, for example, the participation by Dr. Angelique Green in an April 2, 2015 adverse determination and the participation by Dr. Peter Stangel and an "Appeals Coordinator" identified as "Laura C" in the related April 10 adverse appeal decision, which revived and reasserted wrongful positions, previously taken by the three of them in UHC's February 12 and February 26 denials of care, that Jonathan Davidson did not have medical needs requiring skilled care.

33. As a consequence of the failure of UHC and its doctors and other parties to follow procedures for full and fair review of adverse benefit determinations, Jonathan Davidson should be deemed to have exhausted his administrative remedies available under the Davidsons' health plan. UHC's April 10 adverse appeal determination acknowledged such exhaustion, stating: "Please be advised that a final appeal with UnitedHealthcare has been completed on the case. There are no further appeal steps available with us."

34. As part of Defendants' failure to follow procedures for full and fair review, they failed to allow the Plaintiff to submit comments, documents, records and information that should have been allowed to be submitted and should have been taken into account if Defendants had followed proper procedures for full and fair review of their wrongful determinations denying coverage and care for Jonathan Davidson. Jonathan has suffered irreversible damage due to the improper conduct of Defendants, including in wrongfully denying him care.

35. To appeal and seek to reverse, remedy and redress the improper determinations, actions, omissions, denial of care and failure to Defendants to follow proper procedures, allow full and fair review and grant appeals that should have been granted, Plaintiff Davidson filed the following two documents annexed hereto as Exhibit A: (i) the Summary Appeal Submission and Challenge (the "Summary Submission") and (ii) the Appeal of United Healthcare Decision and Challenge to United Healthcare Case (the "Appeal and Challenge). The Plaintiff hereby alleges and incorporates the Summary Submission and the Appeal and Challenge and all statements, information, allegations and matters referred to therein as if incorporated in this Complaint in their entirety.

## COUNT I

### (Improper Denial of Care and Appeal)

36. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

37. The determinations, actions and omissions by Defendants in regard to Plaintiff and his care and coverage were arbitrary and capricious, both in the initial determinations, actions and omissions of Defendants and in the failure to grant the relief requested in Plaintiff's appeals. The arbitrary and capricious determinations, actions and omissions of Defendants include the classification of Plaintiff as warranting only "custodial care," the ejection of him from skilled care and facilities and the rejection of his other claims.

38. In their actions, the Defendants failed to comply with ERISA and the regulations promulgated thereunder and with applicable law.

39. The Court should reverse the arbitrary and capricious actions, determinations and omissions of Defendants, including their denial of Plaintiff's initial claims and their failure to grant his appeals. The Court should reverse the determination by Defendants that Plaintiff should treated as warranting, and should be covered only by, custodial care.

40. The Court should grant Plaintiff de novo review of the actions, determinations and omissions of Defendants, including their denial of Plaintiff's initial claims and their failure to grant his appeals.

## COUNT II

### (Failure to Follow Proper Procedures and Provide Full and Fair Review)

41. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

42. In their determinations, actions and omissions, Defendants failed to follow the procedures and requirements provided in the Medical Plan, ERISA, the regulations promulgated thereunder and applicable law in regard to Plaintiff, his care and his appeals.

43. In their response to Plaintiff's appeals, Defendants failed to follow procedures for a full and fair review of the determinations, actions and omissions of Defendants, as required by ERISA, the regulations promulgated thereunder and applicable law, including the denial of care to Plaintiff, the classification of Plaintiff as needing and warranting only "custodial care" and the denial of skilled medical and nursing care and facilities to Plaintiff. Defendants failed to accept submissions of information, comments, records, documents and information from Plaintiffs that should have been accepted and considered by Defendants.

44. The Court should issue injunctive relief ordering Defendants to reverse and correct their failure to follow proper procedures and provide full and fair review and should direct Defendants to accept and consider submissions by Plaintiff and include in Defendants' determinations, decisions and actions proper consideration of such submissions.

## COUNT III

### (Failure to Provide Information and Records)

45. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

46. Defendants have failed to provide information, documents and records properly requested by Plaintiff pursuant to the Medical Plan, ERISA, the regulations promulgated thereunder and applicable law.

47. The Court should order and direct Defendants to produce and deliver to Plaintiff all the information, documents and records requested by Plaintiff from any Defendant.

## COUNT IV

### (Bad Faith)

48. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

49. Defendants have acted in bad faith in their determinations, actions and omissions in regard to Plaintiff.

50. The Court should grant equitable relief to Plaintiff to order Defendants to cease their actions, determinations and omissions made in bad faith. The Court should grant all

compensation to Plaintiff afforded under applicable law to redress and compensate the bad faith of Defendants.

## COUNT V

### (Negligence and Infliction of Emotional Distress)

51. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

52. Defendants have had duties of care in regard to Plaintiff in connection with the Medical Plan and his medical care, health care and therapy.

53. Defendants have violated and failed to perform their duties of care in regard to Plaintiff. He has been harmed as a proximate and foreseeable result of their failures and violations of their duties.

54. Plaintiff has been harmed by the failure and violations of Defendants in regard to their duties of care. Defendants have, among other harms, intentionally inflicted emotional distress on Plaintiff.

55. The Court should grant equitable relief directing Defendants to correct their violations of duties of care and to cease actions inflicting emotional distress. The Court should grant all compensation and redress afforded by applicable law for the violations of duties of care and the emotional distress perpetrated and inflicted by Defendants in regard to Plaintiff.

## COUNT VI

### (Redress Under ERISA Section 1132(a)(3(B)

56. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

57. Defendants have violated their duties and obligations under ERISA, the regulations promulgated thereunder and applicable law.

58. Defendants have been unjustly enriched at Plaintiff's expense by their violations and failures to comply with their duties. It is against equity and good conscience for Defendants to retain the value of their enrichment at Plaintiff's expense.

59. Plaintiff has been irremediably harmed and damaged by the wrongful acts of Defendants and their violations of ERISA, the regulations promulgated thereunder and applicable law.

60. The Court should grant to Plaintiff such equitable and monetary redress as may be permitted by Section 1132(a)(3)(B) of ERISA in order to provide redress to Plaintiff in the form of monetary redress and injunctive relief.

## PRAYER FOR RELIEF

Plaintiff Jonathan Davidson hereby prays for judgment against Defendants as follows.

1. The Court should reverse the arbitrary and capricious actions, determinations and omissions of Defendants, including their denial of Plaintiff's initial claims and their failure to grant his appeals. The Court should reverse the determination by Defendants that Plaintiff should treated as warranting, and should be covered only by, custodial care.

2. The Court should grant Plaintiff de novo review of the actions, determinations and omissions of Defendants, including their denial of Plaintiff's initial claims and their failure to grant his appeals.

3. The Court should issue injunctive relief ordering Defendants to reverse and correct their failure to follow proper procedures and provide full and fair review and should direct Defendants to accept and consider submissions by Plaintiff and include in Defendants' determinations, decisions and actions proper consideration of such submissions.

4. The Court should order and direct Defendants to produce and deliver to Plaintiff all the information, documents and records requested by Plaintiff from any Defendant.

5. The Court should grant equitable relief to Plaintiff to order Defendants to cease their actions, determinations and omissions made in bad faith. The Court should grant all compensation to Plaintiff afforded under applicable law to redress and compensate the bad faith of Defendants.

6. The Court should grant equitable relief directing Defendants to correct their violations of duties of care and to cease actions inflicting emotional distress. The Court should grant all compensation and redress afforded by applicable law for the violations of duties of care and the emotional distress perpetrated and inflicted by Defendants in regard to Plaintiff.

7. The Court should grant to Plaintiff such equitable and monetary redress as may be permitted by Section 1132(a)(3)(B) of ERISA in order to provide redress to Plaintiff in the form of monetary redress and injunctive relief.

8. The Court should grant the relief and actions requested in the Summary Submission and the Appeal and Challenge.

# EXHIBIT A

Dated: Monday
     April 11, 2016

Respectfully submitted,

_Jonathan Davidson_

Jonathan Davidson, pro se, by
    Corinna Davidson under Power
    of Attorney dated September 30,
    2012
5675 Via Junipero Serra
Riverside, California 92506
Telephone: (858) 531-7578
Telefacsimile: (951) 823-0410
Email address:
    law.davidson@gmail.com

# SUMMARY
## APPEAL SUBMISSION AND CHALLENGE

### BY JONATHAN DAVIDSON

### AGAINST

### WRONGFUL DENIAL OF HEALTH CARE

### <u>BY UNITED HEALTHCARE (UHC) AND UHC DOCTORS</u>

Jonathan Davidson is a husband, father and attorney who was diagnosed in 2009 with a disabling neurodegenerative disease, amyotrophic lateral sclerosis (ALS), also known as Lou Gehrig's disease. He is aware and perceptive, mentally sharp and high-functioning, but ALS has caused him to lose the ability to move his muscles, and he must rely continually on breathing and feeding tubes and trained and skilled healthcare professionals to survive. If he does not receive constant respiratory care, he could suffer respiratory failure within minutes and die.

Despite Jonathan's disability and critical medical needs, UnitedHealthcare (UHC) and its doctors and others have tried to deny that he requires any skilled medical care and have acted as though he does not have ALS disease. They concluded that his skilled care in a rehabilitation center should be terminated and that he needed only "custodial care" at home, which would not be covered and paid for under a group health benefits plan administered by UnitedHealthcare.

In deciding that Jonathan could be terminated from skilled care in a rehabilitation center, UHC Medical Director Angelique Green, MD, on February 12, 2015 seemed to ignore his ALS and asserted in regard to Jonathan, "You had a nerve problem. You had breathing trouble." When the Davidsons appealed that ejection of Jonathan from skilled care, UHC relied on Doctor Peter Stangel to review and uphold Dr. Green's determination. Dr. Stangel declared in a February 26 decision, "You have no medical needs requiring inpatient skilled care." His assertion was made in spite of a February 23 letter from one of Jonathan's physicians, which stated: "Mr. Davidson requires continued care in a skilled nursing facility." The February 12 and February 26 denials of care by UHC Doctors Green and Stangel were reversed by UHC on appeal on March 5. However, in yet another UHC denial of care on April 10, 2015, Doctor Stangel revived his discredited position in order to uphold an April 2 denial of benefits by Dr. Green. Dr. Stangel stated about Jonathan in that April 10 adverse determination: "We do not see that you have skilled medical needs."

The shocking and indefensible nature of these denial of care decisions by UHC and its doctors is starkly obvious in light of reports from other physicians who have cared for Jonathan Davidson since his diagnosis with ALS in 2009. For example, letters from three of Jonathan's doctors dated April 29, May 1 and May 28, 2015 are attached to this Summary. The letters are also cited in the longer Appeal Submission and Challenge brief that is attached hereto, which has been prepared by Jonathan and Corinna Davidson in their struggle to obtain full and fair review of the latest improper denial decisions made by UHC and its doctors on April 9 and 10, 2015. In

the attached April 29 letter from Dr. Laura Nist, a physician who has been involved with Jonathan's care since his ALS diagnosis in 2009, she describes his medical needs and the "complications" that would arise "if Jonathan were to receive care at home with non skilled providers." Dr. Nist, who is a neurologist and Director of an ALS clinic at a university hospital in California, reports in her April 29 letter:

> "The needs of an ALS patient with chronic neuromuscular respiratory failure and severe, generalized weakness include tracheostomy and ventilatory care, skin care and prevention of skin breakdown and ulcer formation, adequate GI [gastrointestinal] function and prevention of constipation and fecal impaction balanced with adequate nutritional intake, effective removal of urine without prolonged moisture on the skin and skin breakdown, and challenges with communication….Jonathan needs skilled medical care. The lack of skilled medical care puts Jonathan at risk for infection, aspiration pneumonia, skin breakdown, lack of response to potential cardiac and pulmonary events (as have occurred in the past), medication errors, and inadequate recognition of decline in health and rapid responsiveness to decline."

In their denials of Jonathan Davidson's critical needs, UnitedHealthcare and its doctors and others tried to send him home for "custodial care" that does "not require special skills or training," effectively depriving him of the ongoing medical attention from physicians and other skilled and trained medical personnel that he needs to survive. Such "custodial care" would no doubt have saved money for the health benefits plan administered by UHC, because UHC asserted that custodial care was not covered by that plan.

Jonathan Davidson and his wife Corinna and five-year-old son Jake have been terribly damaged by the attempted denial of care by UHC as administrator of the Hewlett-Packard group health benefits plan that covers the Davidsons. With round-the-clock efforts to handle and coordinate care for Jonathan, parenting for Jake and Corinna's financial support of her family as an employee at Hewlett-Packard, the Davidsons have fought to find means of balance and survival in their life in the years since Jonathan's diagnosis. Corinna was able to work and, against odds, completed an MBA and professional certifications that strengthened her ability to care for her family. Their chance for care and continuation of a family life together was shattered by the improper denial of medical care coverage by UHC.

In response to continued appeals and challenges made by the Davidsons, certain benefits and skilled care for Jonathan and his ALS disabilities have been restored. However, in light of the manipulation of care determinations by UHC and its medical personnel and others and their failure to follow procedures required for full and fair review of their wrongful denials of care, Jonathan and Corinna Davidson feel that it is advisable to submit this Summary and the attached Appeal Submission and Challenge brief presenting further information and documents that UHC previously cut them off from submitting. The attached, extensive brief was prepared by Jonathan by laboriously "typing" the document using a Tobii device that selects letters from a visual keyboard, one-by-one, when he focuses his eyes on each letter (the same method that he previously used to write a law book while disabled with ALS). As shown in the attached brief, the conduct of UHC and UHC doctors and others has been wrongful in their adverse benefits determinations and in their failure to follow proper procedures for full and fair review of those

denials. The wrongful and improper actions of UHC and its doctors and other parties include the following.

A.    Ejection of Jonathan from Skilled Care and Improper Downgrade to "Custodial Care". As documented in the attached Appeal Submission and Challenge brief prepared by Jonathan and Corinna Davidson and the exhibits thereto, UHC's February 12 and February 26, 2015 decisions to terminate and eject Jonathan Davidson from skilled care at the Reche Canyon Rehabilitation Center in California cannot be defended. His ALS disability and constant medical needs obviously justify "skilled care," which is described by UHC, in its adverse decisions, as services "delivered or supervised by licensed technical or professional medical personnel in order to obtain the specified medical outcome and provide for the safety of the patient." In contrast, the "custodial care" at home that UHC tried to force Jonathan into is described by UHC as "services that do not require special skills or training" and that "do not require administration by trained medical personnel in order to be delivered safely and effectively."

In response to an appeal filed by the Davidsons, the adverse initial determination and the "first level" appeal decision by UHC and its doctors on February 12 and 26 were both overturned by a "second level" UHC appeal decision on March 5, 2015. That March 5 determination approving skilled medical care stated that it was valid through April 19, 2015. In spite of that March 5 decision, UHC on April 2 issued an adverse determination in regard to another skilled care facility, Bridge 2 Life, to which the Davidsons wished to move Jonathan for improved care. The April 2 decision by UHC again attempted to call into question whether Jonathan would be covered for treatment with "Inpatient Services; Skilled Nursing Facility." In response to an urgent appeal by the Davidsons on April 7 challenging the April 2 denial, UHC issued an adverse determination on April 9 that directly contradicted the long clinical record of Jonathan Davidson and also violated the March 5 reversal of UHC's February 12 and 26 denials of skilled care. Entirely overlooking the history of Jonathan Davidson's ALS disability and the March 5 determination, the April 9 "first level" appeal decision stated: "We did not receive any clinical information to show that you continue to need skilled nursing care." In a "second level" appeal decision on April 10 affirming the first level denial issued the day before, Dr. Peter Stangel presented again his indefensible position that Jonathan did not have "skilled medical needs." Dr. Stangel added that "residential treatment is not a covered benefit, based on your health plan policy." UHC's April 10 denial went on to state that "custodial care" for Jonathan would not be covered by the Davidsons' benefit plan.

B.    Improper Denial of a Skilled Congregate Living Health Facility. In addition to reviving the improper denial of "skilled care" for Jonathan that was overturned on March 5, the April 2, April 9 and April 10, 2015 adverse determinations by UHC incorrectly maintained that the Bridge 2 Life facility, where the Davidsons wished to move Jonathan for improved care, was a "congregate living facility" that was not a "covered benefit" under the Davidsons' health benefit plan. In fact, as shown in the attached Appeal Submission and Challenge brief, by March 27 Bridge 2 Life had submitted all documentation requested by UHC for approval of Bridge 2 Life as a "congregate living health facility" and "skilled nursing facility" regulated by the California Department of Public Health, rather than just a "congregate living facility."

3

C.  Failure to Follow Full and Fair Review Procedures on Adverse Denials of Care.  As discussed at length in the attached Appeal Submission and Challenge brief, UHC and its doctors and others failed to follow procedures for a full and fair review of the adverse benefit determinations that denied care and coverage to Jonathan under the health plan covering the Davidsons.  The failure to allow full and fair review includes the following: (1) the issuance of adverse decisions denying Jonathan's right to skilled care on April 2, April 9 and April 10, 2015, in contradiction and violation of the prior March 5 UHC appeal decision, which approved skilled care for Jonathan through April 19; (2) decisions by UHC to affirm adverse determinations before the Davidsons had an opportunity to submit information and material appealing the determinations; (3) the immediate issuance by UHC of a "second level" appeal decision on April 10 affirming the "first level" appeal determination made by UHC on April 9, as well as other improper actions and decisions by UHC and its doctors that circumvented the health plan's two-level appeal process and cut off Jonathan Davidson's ability to submit written comments, documents, records and other information relating to his claims for benefits and related appeals; (4) failing to provide full and fair reviews that took into account all comments, documents, records and other information submitted by Jonathan relating to his benefits claims and UHC's adverse determinations; and (5) improperly affording deference to initial adverse determinations and improperly allowing individuals involved in those adverse decisions to conduct review of the determinations.  Instances of such improper deference and conduct of reviews include, for example, the participation by Dr. Angelique Green in an April 2, 2015 adverse determination and the participation by Dr. Peter Stangel and an "Appeals Coordinator" identified as "Laura C" in the related April 10 adverse appeal decision, which revived and reasserted wrongful positions, previously taken by the three of them in UHC's February 12 and February 26 denials of care, that Jonathan Davidson did not have medical needs requiring skilled care.

As a consequence of the failure of UHC and its doctors and other parties to follow procedures for full and fair review of adverse benefit determinations, Jonathan Davidson should be deemed to have exhausted his administrative remedies available under the Davidsons' health plan.  UHC's April 10 adverse appeal determination acknowledged such exhaustion, stating: "Please be advised that a final appeal with UnitedHealthcare has been completed on the case. There are no further appeal steps available with us."  In order to exercise and preserve their rights, the Davidsons are submitting this Summary and the attached Appeal Submission and Challenge brief, which includes comments, documents, records and information that should have been allowed to be submitted and should have been taken into account if UnitedHealthcare and its doctors and other parties had followed proper procedures for full and fair review of their wrongful determinations denying coverage and care for Jonathan Davidson.  Jonathan has suffered irreversible damage due to the improper conduct of UnitedHealthcare and the doctors and others who acted with UHC to wrongfully deny him care.

Dated:  October 5, 2015

/s/ Jonathan Davidson by Corinna
Davidson under Power of Attorney
dated September 30, 2012_____
    Jonathan Davidson

 /s/ Corinna Davidson_____
    Corinna Davidson



## LOMA LINDA UNIVERSITY
### HEALTH SYSTEM

RE: Jonathan Davidson
DOB: 12/15/1948

April 29, 2015

**FMO NEUROLOGY
(LLUSM)**
11370 Anderson St, Ste B-100
Loma Linda CA 92354-3450
Phone: 909-558-2880
Fax: 909-558-2882

To Whom It May Concern,

Mr. Jonathan Davidson is a patient in my neurology clinic with a degenerative neurologic condition, ALS (amyotrophic lateral sclerosis). I have been involved in his care since diagnosis. With the ALS progression over the last years, I continue to be involved in his care including during hospitalizations with guidance to the ICU teams as well as at Reche Canyon Facility with visits. The needs of an ALS patient with chronic neuromuscular respiratory failure and severe, generalized weakness include tracheostomy and ventilatory care, skin care and prevention of skin breakdown and ulcer formation, adequate GI function and prevention of constipation and fecal impaction balanced with adequate nutritional intake, effective removal of urine without prolonged moisture on the skin and skin breakdown, and challenges with communication.

Jonathan has ALS and many comorbidities. The progression of ALS has required tracheostomy and ventilatory support. The respiratory issues require skilled nursing care for tracheostomy care for effective ventilation and prevention of infection, ventilatory care and monitoring by skilled providers for effective ventilation and monitoring as he has had sudden cardio-pulmonary events with acute changes that require intervention, best tracheostomy and ventilatory care for patient safety with trying to prevent infections, including pneumonia, with use of suctioning of excess secretions, medication management with adjustments as clinical changes demand.

These complex medical needs require he continue care to receive safe care in a skilled nursing facility. My opinion is that his needs will not be effectively met by being cared for at home without skilled medical providers.
The alteration of insurance coverage to less skilled needs is in appropriate in this setting of advanced ALS with multiple complications and complex needs for care. The label of only requiring custodial care is inadequate to effectively care for Jonathan's needs and this change has added unnecessary challenges to Jonathan and his family and the additional challenges are unhealthy for their physical health and mental health. I have not been involved in the care of an ALS patient when, to my knowledge, their coverage has been altered to custodial by the insurance carrier. Jonathan needs skilled medical care. The lack of skilled medical care puts Jonathan at risk for infection, aspiration pneumonia, skin breakdown, lack of response to potential cardiac and pulmonary events (as have occurred in the past), medication errors, and inadequate recognition of decline in health and rapid responsiveness to decline.



**LOMA LINDA UNIVERSITY**

**HEALTH SYSTEM**

These needs are appropriate for skilled medical care with continuity. the more changes in care that a patient goes through the more risk there is for alteration in care, inadequate handoff of medical information puts him at risk for the above listed complications, and I recommend interfacility transfers be avoided.

If Jonathan were to receive care at home with non skilled providers, he is at risk of the above listed complications requiring acute care hospital visits and care and late recognition of these complications requiring longer hospital stays. If he did not have resources to continue skilled care during this time I suspect he would have required acute care hospital visits.

Regards,

*Laura Nisimo*

Laura Nisi, MD
Director ALS Clinic, Loma Linda University Neurology
Associate Professor of Neurology, Loma Linda University School of Medicine

# Ancel J. Rogers, MD, FACS
## Thoracic Surgeon
## General Surgeon

CERTIFIED BY
THE AMERICAN BOARD OF
CARDIAC AND THORACIC SURGERY
THORACOSCOPIC SURGERY

CERTIFIED BY
THE AMERICAN BOARD
LAPAROSCOPIC SURGERY

May 1, 2015

RE: Jonathan Davidson

Bridge-to-Life
1331 Addison St.
Perris, Ca. 92571

To Whom It May Concern:

Mr. Jonathan Davidson is a 64 year old, Caucasian male with severe, progressive amyotrophic lateral sclerosis (ALS). He is at bedrest with essentially no extremity motor function. He requires total care as he suffers from dense quadriplegia. He also has respiratory failure and is ventilator dependent. His poor pulmonary function demands frequent pulmonary interventions, which includes suctioning, tracheostomy change and hand ventilation. Mr. Davidson requires the use of a ventilator and oxygen tank. He requires continuous O2 saturation monitoring.

This patient has specific caregivers at Bridge to Life that are uniquely trained and experienced in respiratory care, wound (pressure sore) prevention and providing support with activities of daily living for this severely ill patient. They are also trained to provide rapid response care any time of the day or night for life-threatening events that may occur. As the attending physician for Bridge-to-Life, this patient requires, and is indeed receiving, care that far exceeds that care rendered at the usual skilled nursing facility.

My associates and I work closely with the Bridge-to-Life staff to provide a level of care that in my view is necessary to maintain this patient and to prevent severe life-threatening complications.

If you have any further questions or concerns, please do not hesitate to contact me at the number and address shown below.

Sincerely,

Ancel J. Rogers, MD, FACS, QME
Certified by the American Board of Thoracic Surgery
Certified by the American Board of Surgery

AJR/gm

1550 E Washington St
Suite 101
Colton, CA

(909) 370-4400 Office                    (909) 422-1588 Fax



FMO Internal
Medicine Pulmonary
Clinic
11370 Anderson St,
Ste 3300,
Loma Linda CA
92354-3450
Phone: 909-558-2896
Fax: 909-558-2079

May 28, 2015

Patient:     Jonathan Davidson
Date of Birth: 12/15/1948
Date of Visit: 5/28/2015

To Whom It May Concern:

Subject: Davidson, Jonathan, JD.
DOB 12.15.1948, LLUMC MRN 6256751

This is to verify that I am acquainted with Dr Davidson's medical case from a
consultation with him on 11.7.2013, office visits on 1.7.2014, 2.13.2014, 4.8.2014,
5.15.2014 and 7.15.2014. I have also seen him several times when he was hospitalized.

I have been told that there is disagreement as to the medical, nursing and respiratory
care services needed for Mr Davidson's care.

Mr Davidson suffers from progressive and severe generalized weakness of his muscles
due to Amyotrophic Lateral Sclerosis, AKA Lou Gehrig's Disease. At his last LLUMC
admission on 12.1.2014 has was described as on a chronic ventilator to a tracheostomy
tube, able to nod and shake his head and move his toes but no visible movement of his
upper and lower extremities otherwise. He was unable to speak. He was fed through a
gastrostomy feeding tube.

From my experience I know that he has a very weak cough and is unable to clear lung
secretions on his own and that he tends to have life-threatening dips in his blood
oxygen levels unless there is a trained person nearby watching at all times to apply
oxygen, suction out his tracheostomy tube and airways and apply cough assistance
techniques. He also is unable to reconnect his ventilator tubing should it accidentally
separate from his tracheostomy, placing his life at risk within minutes as he is unable to



## LOMA LINDA UNIVERSITY
### HEALTH SYSTEM

adequately breathe on his own. He needs a heated humidification system for his inhaled gases at all times to prevent his airway secretions from drying out, plugging his airways and again putting him at risk of low oxygen levels and vital organ injury.

Mr Davidson is unable to feed himself, turn over in bed or do his own grooming or toiletting.

Since there is no known treatment which results in significant long-term improvement in this progressive condition it is imperative that he be cared for in an environment where there are no lapses in his observation and treatment by skilled nursing and respiratory care staff..

Sincerely yours,

David Bland, MD, FACP, FCCP
Medical Director, Medical Intensive Care Unit
Loma Linda University Medical Center

Associate Professor of Medicine
Loma Linda University School of Medicine

**Appeal of UnitedHealthcare Decision Issued April 9, 2015 (Case ID K0981158003) and Challenge to UnitedHealthcare Case ID K1001026004, Issued April 10, 2015 Denying Coverage to Jonathan Davidson for Skilled Nursing Care at the Bridge 2 Life Congregate Living Health Facility**

This is an appeal to invalidate UnitedHealthcare [UHC] Case ID K0981158003 [UHC Case ID 8003], issued April 9, 2015, and a challenge to UHC Case ID K1001026004 [UHC Case ID 6004], issued a day later on April 10, 2015. The two UHC Cases improperly affirmed the denial of skilled nursing coverage to Jonathan Davidson at the Bridge 2 Life health facility and failed to provide him a proper opportunity for full and fair review of that adverse benefit determination. Mr. Davidson was diagnosed with ALS (amyotrophic lateral sclerosis) in August 2009. He lacks functional capacity in his arms and legs. He uses an eye gaze communication device to write and to "speak." He depends on ventilator support due to his diminished lung capacity.

The denial in UHC Case ID 6004 rests on the opinion of Peter Stangel, MD:

> You asked for coverage for admission into a congregate living facility.... You have are [*sic*] being maintained on a ventilator. Ventilator care does not, in its self, constitute skilled care. **We do not see that you have skilled medical needs.** [Emphasis added][1]

This was Dr. Stangel's second opportunity to improperly assert Mr. Davidson's custodial care status without care by skilled and trained health professionals. In UHC Case ID 8001[2], dated February 26, 2015, Dr. Stangel had sustained Angelique Green, MD, Medical Director's decision on February 12, 2015, to terminate skilled nursing coverage effective February 19, 2015.[3]

---

[1] UHC Case ID 6004, signed by Laura C., Appeals Coordinator, on April 10, 2015. (Attachment A) (Finding 11)

[2] UHC Case ID 8001, signed by Laura C., Appeals Coordinator, on February 26, 2015. (Attachment B) ( Finding 5)

[3] UHC Service Ref: 8083484300 [UHC Service Ref 4300], signed by Angelique Green, MD, Medical Director, on February 12, 2015. (Attachment C) (Finding 4) *"You had a nerve problem. You had breathing trouble.... You do not need to be in this facility for your care."*

> <u>You have a neurologic illness</u> and are maintained on a ventilator. **You have no medical needs requiring inpatient skilled care. You are at a custodial level of care.** [Emphasis added]

Allowing the same physician to rule again on the same case undermines the integrity of UnitedHealthcare's two-tiered appeals structure.

There are more dimensions of wrongfulness in UHC Case ID 8003 and UHC Case ID 6004. On March 5, 2015, UHC Case ID K0611331004 [UHC Case ID 1004] reversed prior custodial decisions by the Medical Director and Dr. Stangel.[4] It reinstated coverage for skilled nursing through April 19, 2015. UHC Case ID 8003 dated April 9 and UHC Case ID 6004 the next day ignored or neglected this preemptive March 5 ruling. Corinna Davidson learned of that March 5 decision by phone on March 6, 2015. From that call through the following weeks, her persistent efforts to get Bridge 2 Life [Bridge] accepted as a skilled care provider were unsuccessful. (See Finding 8 below.)

By March 27, 2015, Bridge had submitted all information requested by UHC to become a provider.[5] When Mrs. Davidson called UnitedHealthcare on March 31, 2015, she was told that Bridge 2 Life had already been denied. The representative said further that Mr. Davidson would have to file a Second Level Appeal because the denial was written as First Level decision.[6]

---

[4]UHC Case ID 1004, signed by Ana V., Appeals Coordinator, overturned UHC Service Ref 4300 dated February 12, 2015 and UHC Case ID 8001 dated March 2, 2015. (Finding 6) *"Based on the information reviewed, we are pleased to inform you that we will process the claim relevant to these services accordingly. This decision is valid through April 19, 2015."*

[5] In one conversation, co-owner Lori Talley clarified that Bridge 2 Life is a Congregate Living Health Facility licensed by the California Department of Public Health. (Letter from Lori Talley to Corinna Davidson (Attachment M, Finding 8)

[6]These March 31, 2015, declarations raise concerns since a First Level denial was not issued until April 9, 2015. (UHC Case ID 8003) In any case, the Medical Director initiated a new decision line on April 2, 2015, by denying Bridge 2 Life as a skilled nursing facility

However, the next decision letter was an initial Service Reference on April 2, 2015,[7] issued by Angelique Green, MD, Medical Director. A First Level decision was not issued until April 9, 2015 in response to Mr. Davidson's appeal of Dr. Green's Service Reference letter.

UHC Service Ref 2900 [UHC Service Ref 2900], dated April 2, 2015 rejected Bridge 2 Life as a health facility by classifying it as a type of residential group home.[8] This designation reintroduced Dr. Green's earlier clinical assessment that Mr. Davidson requires only custodial care. The Service Reference also neglects information provided to UnitedHealthcare that Bridge 2 Life is a Congregate Living Health Facility with specific authorization from the California Health and Safety Code.[9] Section 1250 (i) (1) of the Code defines this health facility class as providing care that is *"generally less intense than that provided in general acute care hospitals but more intense than that provided in skilled nursing facilities.* [10]

Jonathan Davidson filed an urgent appeal on April 7, 2015 (Attachment P), and, as directed by the UnitedHealthcare representative by telephone on March 31, 2015, he labeled that appeal as a Second Level appeal. (See Finding 11 below.) Corinna Davidson called UHC on April 9, 2015, and was told that the fax transmission of the urgent appeal had not been received. On April 10,

---

[7]A Service Reference is the initial determination whether a requested treatment, procedure, or other medical action is covered. The matter of whether Bridge to Life qualifies as a skilled nursing facility is not a discretionary medical decision. It is whether a particular requested facility meets the established standards for continuous skilled nursing care. This Service Reference is unusual in that respect. Classifying Bridge 2 Life as a residential group home ignores the fact that there is licensed nurse and Certified Nurse Assistant present at all times.

[8]UHC Service Ref. 8407422900 [UHC Service Ref 2900] signed by Angelique Green, MD, Medical Director on April 2, 2015. (Attachment F) (Finding 8) *"A congregate living facility is a type of group home.... We have determined that this does not meet those rules of your policy."*

[9]Letter from Lori Talley. (Attachment E)

[10]Finding 3 below includes the relevant Code provisions, the licensing requirements issued by the California Department of Public Health, and a copy of Bridge 2 Life's license. (Attachment H)

2015, however, a representative confirmed receipt, and informed her that a decision letter was issued that day.

UHC Case ID 6004 dated April 10 signed by Laura C., Appeals Coordinator, indicates that it is the Second Level final appeal of UHC Case ID 8003, issued April 9, 2015.[11] That April 9 First Level decision letter sustained the Medical Director's Service Reference denial dated April 2. However, UHC Case ID 8003 stated clearly that Mr. Davidson would have a Second Level opportunity to show a continuing need for skilled nursing. UHC Case ID 8003 also asserted that UHC had not received evidence that Bridge 2 Life is certified by the State of California as a skilled nursing facility. UHC Case ID 8003 states further that Mr. Davidson has sixty days to file a next level appeal. If upheld, UHC Case ID 6004 forecloses that right on Day One! This document also serves to provide documents and information in connection with the Second Level appeal of UHC Case ID 8003, issued April 9, 2015.

UHC Case ID 6004 declares that it is UnitedHealthcare's final determination, with the only remaining option to request an independent third party review.[12] Dr. Stangel repeats his pattern of support for Dr. Green's Service References. Laura C., Appeals Coordinator, signs and participates in the first and second level appeals. If this determination could stand, UHC Case ID 6004 dated April 10, 2015, would have succeeded in denying medically necessary coverage to Jonathan Davidson. That step-down to custodial status without skilled medical care would be accomplished by ignoring his true medical needs, overriding his attending physician, bypassing a preemptive ruling, and allowing two doctors to reinject their discredited opinions.

This Appeal Challenge will show that Jonathan Davidson is receiving skilled nursing care at the State-licensed Bridge 2 Life Congregate Living Health Facility. It includes information provided

---

[11] UHC Case ID 8003, signed by Paloma R., Appeals Coordinator, on April 9, 2015. *"Please note, we have no additional grievances on file for this claim and have processed this correspondence as a First Level Appeal."* (Attachment G) (Finding 9)

[12] UHC Case ID 6004 *"Please be advised that a final appeal with UnitedHealthcare has been completed on the case."* (Attachment A)

by Mr. Davidson's physicians, respiratory therapist, owners of the Bridge 2 Life facility, and Corinna Davidson. It also provides a more detailed account of the wrongful actions that have created unnecessary risks to Mr. Davidson's physical and mental health.[13]

The following findings demonstrate that UHC Case ID 8003, issued April 9, 2015, and UHC Case ID 6004, issued April 10, 2015, are invalid, wrongfully attempt to preclude Jonathan Davidson's right to skilled care and ail to provide him an opportunity for full and fair review of the adverse benefit determinations by UHC.

Finding 1: Jonathan Davidson's medical status of progressive neurological effects of ALS requires skilled nursing care.

Finding 2: Bridge 2 Life is a Congregate Living Health Facility authorized by the California Health and Safety Code and licensed by the Department of Public Health.

Finding 3: Jonathan Davidson is receiving skilled nursing care at Bridge 2 Life.

Finding 4: UHC Service Ref: 8083484300, signed by Angelique Green, MD, Medical Director, on February12, 2015, notifies Mr. Davidson that coverage for skilled nursing ends February18, 2015.

Finding 5: UHC Case ID K0541718001, signed by Laura C., Appeals Coordinator on February 26, 2015 (Attachment I), upholds the denial of continued coverage for skilled nursing care. The decision finds that Mr. Davidson's medical needs are custodial.

Finding 6: The decision to transfer Jonathan Davidson's care to Bridge 2 Life on March 4, 2015 was in consideration of the confirmed denial of skilled nursing facility coverage and his negative experience at Reche Canyon Regional Rehab Center.

Finding 7: The Second Level decision in UHC Case ID K0611331004, signed by Ana V., Appeals Coordinator, overturns UHC Service Ref: 8083484300 and UHC Case ID K0541718001. It reinstates skilled nursing care coverage through April 19, 2015.

Finding 8: From March 6, 2015 through April 9, 2015 Corinna Davidson speaks with multiple UnitedHealthcare representatives to grant provider status to Bridge 2 Life.

---

[13]Administrators of the Hewlett-Packard Benefit Plan informed Mr. Davidson that coverage for skilled nursing care is reinstated for the duration of his life. (Attachment E, Correspondence from Robyn Young, U. S. Health and Welfare Benefits, Hewlett-Packard, to Corinna Davidson, on August 11, 2015.)

Finding 9:  UHC Service Ref 8407422900 signed by Angelique Green, MD, Medical Director on April 2, 2015 rejects Bridge 2 Life as a service provider. It finds that a "congregate living facility" is a type of group home [and] not a covered benefit."

Finding 10: UHC Case ID K09811158003 signed by Paloma R., on April 9, 2015, sustains the denial of Bridge 2 Life as a provider for skilled care.  The letter states that this is a First Level appeal.

Finding 11:  UHC Case ID K1001026004, signed by Laura C., Appeals Coordinator, on April 10, 2015 violates UnitedHealthcare's commitment to the Second Level appeal process. It reverts Jonathan Davidson to custodial status, denies coverage for Bridge 2 Life, and claims that it has finalized the UHC internal appeals process.

Finding 12:  UnitedHealthcare management of the Hewlett-Packard Group Employee Welfare Benefit Plan has negatively impacted the physical and mental health of Jonathan Davidson and his family through decisions to deny medically necessary skilled care at the Bridge 2 Life Congregate Living Health Facility.


**Finding 1:  Jonathan Davidson's medical status of progressive neurological effects of ALS requires skilled nursing care.**

The ALS Association provides the following definition:

> ALS, or amyotrophic lateral sclerosis, is a progressive neurodegenerative disease that affects nerve cells in the brain and the spinal cord. …When a muscle has no nourishment, it "atrophies" or wastes away. "Lateral" identifies the areas in a person's spinal cord where portions of the nerve cells that signal and control the muscles are located. As this area degenerates it leads to scarring or hardening ("sclerosis") in the region.

> Motor neurons reach from the brain to the spinal cord and from the spinal cord to the muscles throughout the body. The progressive degeneration of the motor neurons in ALS eventually leads to their demise. When the motor neurons die, the ability of the brain to initiate and control muscle movement is lost. With voluntary muscle action progressively affected, people may lose the ability to speak, eat, move and breathe. The motor nerves that are affected when you have ALS are the motor neurons that provide voluntary movements and muscle control.[14]

---

[14] *"What is ALS?"*  http://.alsa.org/about-als/what-is-als.html.

Laura C., Appeals Coordinator, includes the applicable policy criteria for skilled nursing and custodial care in this April 10, 2015, decision letter:

**Skilled Care -skilled nursing, teaching, and rehabilitation services when:**

- **they are delivered or supervised by licensed technical or professional medical personnel in order to obtain the specified medical outcome and provide for the safety of the patient;**
- **a Physician orders them;**
- **they are not delivered for the purpose of assisting with activities of daily living, including dressing, feeding, bathing or transferring from a bed to a chair;**
- **they require clinical training in order to be delivered safely and effectively; and**
- **they are not Custodial Care, as defined in this section.** [Emphasis added]

Custodial Care - services that do not require special skills or training and that:

- provide assistance in activities of daily living (including but not limited to feeding, dressing, bathing, ostomy care, incontinence care, checking of routine vital signs, transferring and ambulating);
- are provided for the primary purpose of meeting the personal needs of the patient or maintaining a level of function (even if the specific services are considered to be skilled services), as opposed to improving that function to an extent that might allow for a more independent existence; or
- **do not require continued administration by trained medical personnel in order to be delivered safely and effectively.** [Emphasis added.] (Attachment A)

Under these classifications, coverage would not be extended to assistance with daily living. Further, custodial care can include elements that require skilled tasks. Skilled nursing care must be medically necessary, ordered by a physician, and "delivered or supervised by licensed technical or professional medical personnel." Care must be administered by "licensed technical or professional medical personnel... [with] clinical training in order to be delivered safely and effectively."

Mr. Davidson's need for continuous skilled medical care is addressed by his neurologist, pulmonologist, and attending physician at Bridge 2 Life. Laura Nist, MD, is Associate Professor of Neurology, Loma Linda University School of Medicine. David Bland, MD, FACP, FCCP, is Medical Director, Medical Intensive Care Unit, Loma Linda University Medical Center, and Associate Professor of Medicine at Loma Linda University School of Medicine. Ancel J. Rogers, MD, FACS, QME, is Mr. Davidson's attending physician at Bridge 2 Life. Dr. Rogers is a cardiologist and Associate Clinical Professor of Surgery at UCLA School of Medicine.

Dr. Nist describes the progressive impacts of ALS on Mr. Davidson's health:

> Mr. Jonathan Davidson is a patient in my neurology clinic with a degenerative neurologic condition, ALS (amyotrophic lateral sclerosis). I have been involved in his care since diagnosis. With the ALS progression over the last years, I continue to be involved in his care including during hospitalizations with guidance to the ICU teams as well as at Reche Canyon Facility with visits....
>
> The respiratory issues require skilled nursing care for tracheostomy care for effective ventilation and prevention of infection, ventilatory care and monitoring by skilled providers for effective ventilation and monitoring as he has had sudden cardio-pulmonary events with acute changes that require intervention...
>
> **These complex medical needs require he continue care to receive safe care in a skilled nursing facility.** [Emphasis added] (Attachment J)

Dr. Bland provides further clinical assessment and critical needs for skilled medical care:

> ...From my experience I know that he has a very weak cough and is unable to clear lung secretions on his own and that he tends to have life threatening dips in his blood oxygen levels unless there is a trained person nearby watching at all times to apply oxygen, suction out of tracheostomy tube and airways and apply cough assist techniques. He also is unable to reconnect his ventilator tubing should it accidentally separate from his tracheostomy, placing his life at risk within minutes as he is unable to adequately breathe on his own. He needs a heated humidification system for his inhaled gases at all times to prevent his airway secretions from drying, plugging his airways and again putting him at risk of low oxygen levels and vital organ injury. (Attachment K)

Dr. Rogers describes Jonathan Davidson's current medical status at Bridge 2 Life:

He requires total care as he suffers from dense quadriplegia. He also has respiratory failure and is ventilator dependent. His poor pulmonary function demands frequent pulmonary interventions, which includes suctioning, tracheostomy change and hand ventilation. Mr. Davidson requires the use of a ventilator and oxygen tank. He requires continuous O2 saturation monitoring. (Attachment L)

The diagnoses and medical assessments of Mr. Davidson's treating physicians confirm his continuing need and physician order for skilled care.

### Finding 2: Bridge 2 Life is a Congregate Living Health Facility authorized by the California Health and Safety Code and licensed by the Department of Public Health.

The California Health and Safety Code authorizes the Department of Public Health to license health facilities.[15]  Section 1250 (c) (1) defines "skilled nursing facility":

"Skilled nursing facility" means a health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis. (Attachment H)

Section 1250 (i) (1) defines "congregate living health facility":

"Congregate living health facility" means a residential home with a capacity... of no more than 12 beds, that provides inpatient care, including the following basic services:  medical supervision, 24-hour skilled nursing and supportive care, pharmacy, dietary, social, recreational, and at least one type of service specified in paragraph (2). **The primary need of congregate living health facility residents shall be for availability of skilled nursing care on a recurring, intermittent, extended, or continuous basis. This care is generally less intense than that provided in general acute care hospitals but more intense than that provided in skilled nursing facilities.** [Emphasis added]

(2) Congregate living health facilities shall provide one of the following services:

---

[15]Section 1250 of the California Health and Safety Code authorizes State regulation of health facilities, - including: "General acute care hospital," "Skilled nursing facility," and "Congregate living health facility."  The California Department of Public Health is the licensing agencies for these facilities.

(A) **Services for persons who are mentally alert, persons with physical disabilities, who may be ventilator dependent.**

(B) Services for persons who have a diagnosis of terminal illness, a diagnosis of a life-threatening illness, or both....

(C) Services for persons who are catastrophically and severely disabled. ...

(5) **A congregate living health facility shall have a noninstitutional, homelike environment.** [Emphasis Added] (Attachment H)

The California Department of Public Health regulates Skilled Nursing Facilities (SNF) and Congregate Living Health Facilities (CLHF). The application form for a skilled nursing facility provides the following definition:

A state license is required to operate a SNF v or ICF [Intermediate Care Facility] in California, which are defined as:

● SNF means "a health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis," pursuant to Section 1250(c) of the Health and Safety (H&S) Code. (Attachment H)

The corresponding application form for a CLHF defines this class of health facility:

A state license is required to operate a CLHF in CALIFORNIA, which is defined as: CLHF means a residential home with a capacity, of no more than 12 beds, **except** as provided in Sections 1250(i)(4)(A) & (B) of the Health and Safety (H&S) Code. CLHFs provide inpatient care, including the following **basic services**: *medical supervision, 24-hour skilled nursing and supportive care, pharmacy, dietary, social, and recreational.* Also, CLHFs **shall** provide at least one type of service specified in Sections 1250(i)(2)(A), (B), & (C) of the H&S Code. The primary need of congregate living health facility residents shall be for availability of skilled nursing care on a recurring, intermittent, extended, or continuous basis. This care is generally less intense than that provided in general acute care hospitals but more intense than that provided in skilled nursing facilities (SNF). [No emphasis added] (Attachment C)

Attachment H includes a copy of Bridge 2 Life's Congregate Living Health Facility license issued by the California Department of Public Health.

Further information regarding the Bridge 2 Life facility is provided by Director of Operations, Vivian Bazley, in a letter dated May 15, 2015:

> Bridge 2 Life is a six bed Congregate Living Health Facility (CHLF) providing residential care to clients who need high level medical and therapeutic services 24 hours a day. ... A critical element in the Bridge 2 Life facility is the patient to skilled nursing staff ratio. For someone like Jonathan Davidson, the staff is able to get to know him, understand without words his needs, and provide a higher level of care. (Attachment V)

Medical records track all services and health data and are maintained in accordance with industry standards including Medication Administration Records (MARs).

### Finding 3: Jonathan Davidson is receiving skilled nursing care at Bridge 2 Life.

The treatment that Mr. Davidson is presently receiving at Bridge 2 Life meets the requirements for medically necessary skilled nursing care as defined in the Hewlett-Packard Group Employee Welfare Benefit Plan. The attached letter from Lori Talley, Director of Human Resources, explains the required elements to be licensed by the California Department of Public Health as a Congregate Living Health Facility (CLHF):

> CLHFs provide inpatient care, including the following basic services: medical supervision, 24-hour skilled nursing and supportive care, pharmacy, dietary, social, and recreational. The primary need of congregate living health facility residents shall be for availability of skilled nursing on a recurring, intermittent, extended, or continuous basis. [Emphasis added] (Attachment E)

Dr. Ancel Rogers, attending physician at Bridge 2 Life, explains the standard of care that is provided to Mr. Davidson:

> ...This patient has specific caregivers at Bridge 2 Life that are uniquely trained and experience in respiratory care, wound (pressure sore) prevention and providing support with activities of daily living for this severely ill patient. They are also trained to provide rapid response care any time of the day or night for life-threatening events that may occur. **As the attending physician for Bridge-to-Life,**

**this patient requires, and is indeed receiving, care that far exceeds that care rendered at the usual nursing facility.** [Emphasis added] (Attachment L)

Jimmy McDougald, RCP, RRT, is Mr. Davidson's respiratory therapist at Bridge 2 Life.

His attached letter explains that the improved protocols and support equipment have increased his lung capacity from when he left the Reche Canyon facility. Mr. McDougald

...initiated a higher heat humidification system through his ventilator such as would be common in an ICU. Further, his ventilator circuits, a significant pathway for reinfection, are now being changed and discarded weekly. Further, the trach/vent certified RNs and LVN's providing care are consistently suctioning him with lavage and good pulmonary toiletry every 1 to 2 hours. Further, he is receiving regular airway clearance therapy (via Cough Assist) to further mobilize and clear secretions in his distal airways. **As a result of these therapies which are not available at sub-acute, Mr. Davidson has improved and stabilized to the point where the ventilator delivery settings have been modified to accommodate his now larger airway...** [Emphasis added] (Attachment Q)

These changes implement the essential protocols stated by Dr. Bland as essential:

...He needs a heated humidification system for his inhaled gases at all times to prevent his airway secretions from drying out, plugging his airways and again putting him at risk of low oxygen levels and vital organ injury. (Attachment K)

The services being provided to Mr. Davidson relate specifically to breathing treatments, suctioning, airway therapy, changing of his ventilator circuits and critical interventions. At Bridge 2 Life skilled medical care is provided by trach/vent certified RNs and LVNs, as well as Mr. McDougald RCP, RRT and directed by Dr. Rogers.

**Finding 4: UHC Service Ref: 8083484300, signed by Angelique Green, MD, Medical Director on February12, 2015 notifies Mr. Davidson that coverage for skilled nursing care will end February18, 2015.**

Corinna Davidson met with her husband's case manager at Reche Canyon Regional Rehab Center several times from late January to mid-February 2015. At the first meeting she learned that UnitedHealthcare was considering a change in her husband's care status. She called

UnitedHealthcare on February 2, 2015, and spoke with her husband's newly assigned case manager. That representative said she was "very familiar" with the situation, and was assigned to monitor the costs associated with his care since December 5, 2015.[16]

Mrs. Davidson met with the Reche Canyon case manager on February 4, 2015, and was told that UHC had decided to end coverage but that a termination date had not been set. On February 13, 2015, the case manager showed Mrs. Davidson UHC Service Ref. 4300, signed by Angelique Green, MD, Medical Director, and dated February 12, 2015. It set February 18, 2015, as the last date for coverage. Dr. Green stated that Mr. Davidson had a "nerve problem" and "breathing trouble." The clinical reason for ending coverage was that he was not benefitting from skilled services such as therapy to assist with walking or swallowing. The Medical Director made no reference to the decision letter's listed diagnosis:"**518.81: Acute respiratory failure.**" [Emphasis added] or to Mr. Davidson's ALS:

> Here is the specific clinical reason for our decision: You were admitted to a skilled nursing facility on 12/05-2014. You had a nerve problem. You had breathing trouble.... **You do not need to be in this facility for your care**. For example, **you are not receiving daily skilled services.** In your case, you are not receiving therapy to help you walk. You are not receiving therapy to help you swallow. **The care you are getting now is custodial care**. This is care to help you with your daily living. Some examples are preparing food or helping you dress or bathe... **Continued stay in this facility is not covered.** The last covered day of this admission is on 02-18-2015. [Emphasis added] (Attachment C)

A copy of the first page of the Medical Director's Service Reference is on page 14.

---

[16] "*When I researched the situation, I was told by a UHC Case Manager in the Appeals Department she was already aware of our situation. She informed me that she had been assigned to my husband's case December 5th, the last day of his 2014 fourth hospital stay, had been very closely monitoring his case, and was very aware of the details of the situation.*" (Letter from Corinna Davidson, Attachment M)

UnitedHealthcare Services, Inc. on behalf of UnitedHealthcare
5757 Plaza Drive Cypress
CA124-0129
Cypress, CA 90630

 UnitedHealthcare®

February 12, 2015

| Patient: | Jonathan Davidson |
|---|---|
| Service Ref #: | 8083484300 |
| Member: | Corinna Davidson |
| Member ID: | XXXXX7227 |
| Group: | HEWLETT PACKARD |
| Group #: | 0227037 |
| Letter ID: | ADV002_R03 |

JONATHAN DAVIDSON
5675 VIA JUNIPERO SERRA
RIVERSIDE CA 92506

Dear Jonathan Davidson:

We reviewed your request to cover the proposed service(s) for you.

We have determined the following is not covered

- Physician/health care professional: Jean-Claude Hage
- Date(s) of service: 02-19-2015 to  Discharge
- Diagnosis: 518.81 Acute respiratory failure
- Claim Amount: Not applicable
- Denial Code: Not applicable

| Procedure Code | Procedure Description |
|---|---|
| Hospitalization | Skilled Nursing Facility |

Based on the information submitted, your health benefit plan and our MCG Care Guideline Medical Admission Recovery Facility Care GRG; GRG-MED-RF (RFC); UHC Coverage Determination Guideline CDG.008.02 Custodial and skilled care services guideline, we determined that the health care services are not covered.

Our clinical staff reviewed the case, and the services are not eligible expenses under your plan. This decision is based on the following plan language found in the Summary Plan Description in the section entitled Exclusions: All Other Exclusions:

Custodial Care as defined in Section 14, Glossary, or services provided by a personal care assistant.

Custodial Care
Services that do not require special skills or training and that: provide assistance in activities of daily living (including but not limited to feeding, dressing, bathing, ostomy care, incontinence care, checking of routine vital signs, transferring and ambulating); are provided for the primary purpose of meeting the personal needs of the patient or maintaining a level of function (even if the specific services are considered to be skilled services), as opposed to improving that function to an extent that might allow for a more independent existence; or do not require continued administration by trained medical personnel in order to be delivered safely and effectively.

Here is the specific clinical reason for our decision: You were admitted to a skilled nursing facility on 12-05-2014. You had a nerve problem. You had breathing trouble. We reviewed the medical information made available to us. We reviewed the health plan criteria for continued stay. You do not need to be in this facility for your care. For example, you are not receiving daily skilled services. In your case, you are not receiving therapy to help you walk. You are not receiving therapy to help you swallow. The care you are getting now is custodial care. This is care to help you with your daily living. Some examples are preparing food or helping you dress or bathe. Your health plan benefit does not cover custodial care. Continued stay in this facility is not covered. The last covered day of this admission is on 02-18-2015.

**Finding 5: UHC Case ID K0541718001, signed by Laura C., Appeals Coordinator, on February 26, 2015, upholds the denial of continued coverage for skilled nursing care. The decision affirms that Mr. Davidson's medical needs are custodial.**

On Friday, February 20, 2015, Corinna Davidson received a call from Dr. Jean-Claude Hage, Mr. Davidson's attending physician at Reche Canyon. He explained that a doctor from UnitedHealthcare called and asked whether Mr. Davidson could be stepped-down from skilled nursing. Dr. Hage responded sarcastically, "Yes, if you can find someplace that would take him." She demanded that he fix the situation he had created by responding inappropriately to the UHC doctor. Dr. Hage was told that UnitedHealthcare would not reverse the decision, and that Mr. Davidson would need to file an appeal.

Corinna Davidson, exercising Power of Attorney for Jonathan Davidson, filed an appeal of UHC Service Ref 4300 on February 23, 2015 (Attachment N). It included a letter from Dr. Hage stating that:

> **Mr. Davidson requires continued care in a skilled nursing facility.** He is currently on a ventilator and weaning is not expected to be successful based on his diagnosis and current condition. [Emphasis added] (Attachment D)

UHC Case ID 8001 (Attachment B), signed by Laura C., Appeals Coordinator, on February 26, 2015, upheld the Medical Director's denial of continued skilled nursing coverage. (Attachment C) The decision letter relied on the expertise of Peter Stangel, MD. It acknowledged the request from Mr. Davidson's attending physician:

> We reviewed your appeal regarding coverage of the services that you would like to receive from Reche Canyon Regional Rehab Center **as requested by Jean-Claude Hage, MD**. We understand the appeal to state that the requested coverage stay in the skilled nursing facility (SNF) should be reconsidered due to medical necessity. [Emphasis added] (Attachment B)

Dr. Stangel ignored Dr. Hage's assessment, and **told** Mr. Davidson that his medical needs were custodial. His clinical judgement was that there was insufficient proof that continued stay in a skilled nursing facility would be helpful for his "neurologic illness."

You have a neurologic illness and are maintained on a ventilator. **You have no medical needs requiring inpatient skilled care. You are at a custodial level of care.** Per health plan guidelines, continued stay in the SNF is unproven to be helpful for your illness. **You can be cared for at a lower level-of-care.** The denial is upheld for continued SNF stay as of February 19, 2015. [Emphasis added] (Attachment B)

Dr. Stangel's medical records review found no evidence to support a need for skilled nursing. (Attachment B) A closer look at Mr. Davidson's medical records could have uncovered a report on his medical status in December 2014 at Loma Linda Hospital:

At his last LLUMC admission on 12.1.2014 has was described as a chronic ventilator to a tracheostomy tube, able to nod and shake his head and move his toes but no visible movement of his upper and lower extremities otherwise. He was unable to speak. He was fed through a gastostomy feeding tube. (Letter from Robert Bland, MD, Attachment K)

**Finding 6: The decision to transfer Jonathan Davidson's care to Bridge 2 Life on March 4, 2015 was in consideration of the confirmed denial of skilled nursing facility coverage and his negative experience at Reche Canyon Regional Rehab Center.**

The combined impact of UHC denials and negative Reche Canyon experience led the Davidsons to look for an alternative care facility. The UHC Medical Director and a credentialed physician had already terminated coverage. The poor medical treatment at the designated skilled nursing facility was described by Mr. Davidson in this appeal. (UHC Service Ref 2900, Attachment F). This included improper administration of medications, and witnessing an inadequate response while his roommate coded. His worst experience at Reche Canyon was when he stopped breathing after a shower. The CNA failed to respond quickly. When the respiratory therapist arrived with the nurse, his oxygen saturation level had dropped to 23%. He had to be bagged to revive. (Attachment P)

**Finding 7: The Second Level decision in UHC Case ID K0611331004, dated March 5, 2015 signed by Ana V., Appeals Coordinator, overturns UHC Service Ref: 8083484300 and UHC Case ID K0541718001. It reinstates skilled nursing care coverage through April 19, 2015.**

Corinna Davidson filed a Second Level appeal of UHC Case ID 8001 on March 2, 2015. It included a second letter from Dr. Hage with minor wording differences:

> **Mr. Davidson requires skilled continued care services in a skilled nursing facility.** He is currently on tracheostomy and ventilator care due to his diagnosis and current condition. [Emphasis added] (Attachment R)

The following is the text of the appeal:

> Dr. Jean-Claude Hage has clearly stated Jonathan's dependency on skilled services to live. There is not one medical person I have spoken with that can comprehend how United Health Care can possibly believe Jonathan is not dependent upon a sub-acute facility. It is clear by the doctor's expert medical opinion and the facts of his health status that Jonathan must remain in a skilled nursing facility. (Attachment S)

UnitedHealthcare ruled favorably on this Second Level appeal in UHC Case ID 1004, signed by Ana V., Appeals Coordinator, on March 5, 2015. (Attachment D) It overturned Dr. Stangel's First Level ruling in Case ID 8001. (Attachment B) In turn, it reversed the Medical Director's initial determination of custodial status in Service Ref 4300, signed on February 12, 2015. (Attachment C)

> We reviewed your appeal regarding the coverage of the services that you would like to receive from Jean-Claude Hage, MD. An initial appeal was reviewed and responded to on February 26, 2015. We understand the second appeal to state that the services should be eligible for coverage because they are medically necessary.
>
> *Based on the information reviewed, we are pleased to inform you that we will process the claim relevant to these services accordingly. This decision is valid through April 19, 2015.* [Emphasis added] (Attachment D)[17]

---

[17] UHC Case ID 1004, dated March 5, 2015, signed by Ana V., Appeals Coordinator. This decision letter did not include a physician's opinion.

**Finding 8: From March 6, 2015 through April 9, 2015 Corinna Davidson speaks with multiple UnitedHealthcare representatives to grant provider status to Bridge 2 Life**

Corinna Davidson called the Appeals Department on March 6, 2015, to ask for an update on the Second Level appeal of Dr. Stangel's First Level denial. She spoke with Amy, a Supervisor. [No last name was provided.] Amy told her that a decision letter issued March 5, 2015, reinstated skilled nursing coverage through April 19, 2015. When Mrs. Davidson heard that, she asked how Bridge 2 Life could be accepted as a skilled nursing facility. She expressed concern over the high level of health risk in moving her husband from one facility to another. She asked for help to notate his file waiving the requirement to review every 120 days and to allow him to remain at the new facility. Amy agreed that was the best solution, and expressed optimism that it could accomplished in one week's time. Mrs. Davidson left messages for Amy on Friday, March 13, and again on March16, 2015, asking for updates on progress.

On Tuesday, March 17, 2015 Corinna Davidson called the Appeals Department and was escalated to a different supervisor. That supervisor contacted Amy and relayed a message that Amy was unable to reach the Case Manager and would call back that afternoon. Mrs. Davidson did not receive a phone call from Amy. She called again on Friday March 20, 2015, and left another message for Amy and again did not receive a return phone call.

Corinna Davidson spoke with multiple UnitedHealthcare representatives on March 23, 2015. Each call required repeating the sequence of events and request to accept Bridge 2 Life as an equivalent skilled nursing health care facility. At one point she was transferred to a representative who began the call by saying he was supposed to grant a waiver. He asked if the facility owner was on the phone. Mrs. Davidson gave her name and phone number in case they were disconnected. The conference call did not go through and she did not receive a call back. She spent six more hours on March 23rd being transferred multiple times through Appeals, Intake Notification, and Member Services. In that time she was unable to reconnect with the representative.

By March 27, 2015, Bridge 2 Life had transmitted all documents to be designated as a skilled nursing provider. Corinna Davidson called the UHC Appeals Department on March 31, 2015, and was told that the facility was denied. She was also told to file a Level 2 appeal as the decision was written as a Level 1 denial. This did not make sense. It made less sense because an initial Service Reference rejecting the facility was not issued until April 2, 2015. However, the Davidsons followed these instructions by filing an appeal on April 7, 2015, and again on April 9, 2015, when told it had not been received. (Attachment T)

**Finding 9: UHC Service Ref 8407422900 signed by Angelique Green, MD, Medical Director on April 2, 2015 rejects Bridge 2 Life as a service provider. It finds that a "congregate living facility" is a type of group home [and] not a covered benefit."**

Angelique Green, MD, Medical Director, denied Bridge 2 Life's status as a skilled nursing health facility on April 2, 2015. UHC Service Ref 2900[18] states that a "congregate living facility"[19] is a type of group home that is not a covered benefit. Group homes are regulated by the California Department of Social Services. Congregate Living Health Facilities are regulated by the California Department of Public Health under the same authority as hospitals and skilled nursing facilities. [See page 20]

---

[18] Footnote 7 questions why the Medical Director would determine whether Bridge 2 Life meets the criteria for a skilled nursing facility.

[19] A Google search of the term 'congregate living facility' shows Congregate Living Health Facility as the first five links. A copy of that search is on page 21.

# Health Facilities

To select all the licensed Long-Term Care facilities or Licensed Hospitals in California, click on "view all" or select a specific facility type below and click.

### Long-Term Care (view all)

Skilled Nursing Facility (SNF)                                                                                    search
Skilled nursing facility is a health facility or a distinct part of a hospital which provides continuous skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis. A skilled nursing facility provides 24-hours inpatient care and, as a minimum, includes physician, skilled nursing, dietary, pharmaceutical services and an activity program.

Intermediate Care Facility (ICF)                                                                                 search
Intermediate care facility is a health facility, or a distinct part of a hospital or skilled nursing facility which provides inpatient care to patients who have need for skilled nursing supervision and need supportive care, but who do not require continuous nursing care.

Intermediate Care Facility – Developmentally Disabled (ICF-DD)                                                    search
Intermediate care facility for the developmentally disabled is a health facility which provides care and support services to developmentally disabled clients whose primary need is for developmental services and who have a recurring but intermittent need for skilled nursing services.

Intermediate Care Facility – Developmentally Disabled Habilitative (ICF-DDH)                                      search
Intermediate care facility for the developmentally disabled habilitative is a health facility with a capacity of 4 to 15 beds which provides 24-hours personal care, habilitation, developmental, and supportive health services to 15 or fewer developmentally disabled person with intermittent recurring needs for nursing services, but have been certified by a physician and surgeon as not requiring availability of continuous skilled nursing care.

Intermediate Care Facility – Developmentally Disabled Nursing (ICF-DDN)                                           search
Intermediate care facility for the developmentally disabled – nursing is a health facility with a capacity of 4 to 15 beds that provides 24-hours personal care, developmental services, and nursing supervision for developmentally disabled person who have intermittent recurring needs for skilled nursing care but have been certified by a physician and surgeon as not requiring continuous skilled nursing care. The facility serves medically fragile person who have developmental disabilities or demonstrate significant developmental delay that may lead to a developmental disability if not treated.

Congregate Living Health Facility (CLHF)                                                                          search
Congregate living health facility is a residential home with a capacity of no more than 12 beds (except those operated by a city or county which may have a capacity of 59 beds), that provides inpatient care, including the following basic services: medical supervision, 24-hour skilled nursing and supportive care, pharmacy, dietary, social, recreational, and at least one type of the following services: services for persons who are mentally alert, physically disabled persons, who may be ventilator dependent; services for persons who have a diagnosis of terminal illness, a diagnosis of a life threatening illness, or both; services for persons who are catastrophically and severely disabled. The primary need of congregate living health facility residents shall be for availability of skilled nursing care on a recurring, intermittent, extended, or continuous basis. This care is generally less intense than that provided in general acute care hospitals but more intense than that provided in skilled nursing facilities.

 congregate living facility

Web    Maps    Images    Shopping    News    More ▾    Search tools

About 136,000 results (0.49 seconds)

Ads

Ass
www
4.6
Com
Rese

**Congregate living** health **facility** is a residential home with a capacity of no more than 12 beds (except those operated by a city or county which may have a capacity of 59 beds), that provides inpatient care, including the following basic services: medical supervision, 24-hour skilled nursing and supportive care, ...

### Find a Congregate Living Health Facility (CLHF) - SACPROS
www.sacpros.org/Pages/**CongregateLivingHealthFacility**.aspx
You visited this page.

*Feedback*

### [PDF] congregate living health facility - California Department of ...
https://www.cdph.ca.gov/.../LNC-... ▾ California Department of Public Health ▾
May 19, 2011 - The primary need of **congregate living** health **facility** residents shall be for availability of skilled nursing care on a recurring, intermittent, extended, or continuous basis.
You've visited this page 5 times. Last visit: 6/6/15

### Health Facilities Consumer Information System
https://hfcis.cdph.ca.gov/services... ▾ California Department of Public Health ▾
**Congregate living** health **facility** is a residential home with a capacity of no more than 12 beds (except those operated by a city or county which may have a capacity of 59 beds), that provides inpatient care, including the following basic services: medical supervision, 24-hour skilled nursing and supportive care, ...
You've visited this page 2 times. Last visit: 6/2/15

### Applications for Licensing and/or Certification of a Health ...
https://www.cdph.ca.gov/.../Healt... ▾ California Department of Public Health ▾
Jul 8, 2015 - Electronic Delivery of All **Facility** Letters, AFL 10-06 Opens a new browser ... **Congregate Living** Health **Facility** Application Request Letter and ...
You've visited this page 2 times. Last visit: 6/6/15

### Find a Congregate Living Health Facility (CLHF) - SACPROS
www.sacpros.org/Pages/**CongregateLivingHealthFacility**.aspx ▾
**Congregate living** health **facility** is a residential home with a capacity of no more than 12 beds (except those operated by a city or county which may have a ...
You've visited this page 2 times. Last visit: 9/9/15

### Congregate Living Facility, Definition(s) of | Work and Family ...
https://workfamily.sas.upenn.edu/.../**congregate-living-facility**-definitions ▾

Ass
www
Spea
Rate

Vis
www
Assi
Esco

Ass
assi
(951
Qual
High

Lin
www
Lom
**livin**

Ass
assi
37 F
Com

Cor
www
4.5
Sear
The

Dis
www
(818
Assi

In March 2015, Bridge 2 Life provided UnitedHealthcare representatives with required information to become Mr. Davidson's skilled care facility. In these conversations and exchanges of information it was shown that Bridge 2 Life is a Congregate Living Health Facility regulated by the California Department of Public Health. Lori Talley, Bridge 2 Life Director of Human Resources, recalls a conversation when she conveyed that directly to a UHC representative and explained that Bridge 2 Life is a Congregate Living Health Facility:

> Earlier this year at the end of March or early April I spoke to a United Healthcare representative. I informed the representative that we are a Congregate Living Health Facility serving patients who are mentally alert, physically disabled who may be ventilator dependent and need skilled nursing services. [Emphasis added] (Attachment E)

UHC Service Ref 2900, signed by Angelique Green, MD, Medical Director, on April 2, 2015, denied billing for Bridge 2 Life:

> Your doctor has requested admission to a congregate living facility. **A congregate living facility is a type of group home....** We have determined that this does not meet those rules of your policy. **Care in a congregate living facility is not a covered benefit.** [Emphasis added] (Attachment F)

**Finding 10: UHC Case ID K09811158003 signed by Paloma R., on April 9, 2015, sustains the denial of Bridge 2 Life as a provider for skilled care. The letter states that this is a First Level appeal.**

Jonathan Davidson filed an appeal of the Medical Director's April 2, 2015, Service Reference on April 7, 2015. On April 9, 2015, UHC Case ID 8003,[20] issued April 9, 2015, responded:

> We reviewed your appeal regarding coverage of the services that you would like to receive from Bridge 2 Life Healthcare facility. We understand the appeal to state that you are requesting reconsideration of coverage for admission to a congregate living facility. (Attachment G)

---

[20] UHC Case ID 8003, signed by Paloma R., Appeals Coordinator, on April 9, 2015.

The decision by Edward Greenberg, MD, asserted the following in regard to Bridge 2 Life as a skilled nursing facility, and Mr. Davidson's medical need for skilled care:

> You asked for approval for Admission to a long-term residential congregate living facility. We did not receive any clinical information to show that you continue to need skilled nursing care. We also did not received [*sic*] documentation that the facility you requested is certified by the State of California as a skilled nursing facility. (Attachment G)

UHC Case ID 8003 stated clearly that Mr. Davidson would have a second opportunity to justify the need for skilled care at Bridge 2 Life:

> *Please note, we have no additional grievances on file for this claim and have processed this correspondence as a **First Level Appeal**.* [Emphasis added] (Attachment G)

**Finding 11: UHC Case ID K1001026004, signed by Laura C., Appeals Coordinator, on April 10, 2015 violates UnitedHealthcare's commitment to the Second Level appeal process. It reverts Jonathan Davidson to custodial status, denies coverage for Bridge 2 Life, and claims that it has finalized the UHC internal appeals process.**

Corinna Davidson called the Appeals Department on April 9, 2015, and was told that the appeal had not been received. She faxed the appeal again on April 9, 2015. On April 10, 2015, Mrs. Davidson was told that not only had the re-fax been received but that a decision had already been issued.

UHC Case ID 6004 signed by Laura C., Appeals Coordinator, on April 10, 2015, (Attachment A), states that: "An initial appeal was reviewed and responded to on April 9, 2015." UHC Case ID 6004 then declares on the next day that it is the Second Level final appeal of UHC Case ID 8003:[21]

---

[21] UHC stated that Mr. Davidson has 60 days to respond with a Second Level appeal. By stating that it is the final Second Level decision, UHC Case ID 6004 would foreclose Mr. Davidson's opportunity to fully present his case pursuant to that right with 59 days remaining. This Appeal Challenge also serves to provide documents and information in connection with a Second Level Appeal of UHC Case ID 8003, issued April 9, 2015.

We understand the second appeal to state that the denied facility request should be reconsidered for coverage based on medical necessity and the level of care.

UHC Case ID 6004 is wrongful in four dimensions. Foremost, it fails to acknowledge that UHC Case ID 1004 reinstated skilled nursing coverage through April 19, 2015. (Attachment D). Second, it allows Peter Stangel, MD, to rule at two levels, and to reaffirm his overruled opinion that Mr. Davidson's medical needs are custodial.[22] The third wrongful element is that Laura C. participated in both decisions. This violates the principle set out in UHC Service Ref 4300, signed by Angelique Green, MD, Medical Director, on February 12, 2015, (Attachment C) that the person reviewing appeals will not be involved in a prior case decision. Laura C., Appeals Coordinator, participated actively in Mr. Davidson's first and second level appeals.

The first wrongful element is procedural. The Second Level decision in UHC Case ID 1004, signed by Ana V., Appeals Coordinator on March 5, 2015, restored coverage for skilled nursing through April 19, 2015 (Attachment D). It clearly indicated that was reversing the First Level opinion of Peter Stangel, MD: "*An initial appeal was reviewed and responded to on February 26, 2015*." (Attachment B) In turn, it overruled Medical Director Green's initial clinical reasoning that Mr. Davidson's medical needs were custodial (UHC Service Ref 4300, signed February 12, 2015). (Attachment C)

The second wrongful element in UHC Case ID 6004 is that it violates the essence of the UnitedHealthcare two-tiered appeal structure. UHC Case ID 1004 dated March 5, 2015 is a glaringly correct example within the conflicting management of Jonathan Davidson's care coverage. That Second Level decision did not ignore the clear message from Mr. Davidson's attending physician at Reche Canyon that: "*Mr. Davidson requires continued care in a skilled nursing facility.*" (Attachment D)

---

[22] Dr. Stangel affirmed the Medical Director's initial decision to change Mr. Davidson's care level from skilled nursing to custodial. UHC Case ID 8001, signed by Laura C., Appeals Coordinator on February 26, 2015 (Attachment H).

In stark contrast, the decision in UHC Case ID 6004 dated April 10 relies on the same doctor, and is drafted by the same Appeals Coordinator with the same outcome as UHC Case ID 8001, signed by Laura C., Appeals Coordinator, on February 26, 2015. Dr. Stangel's prior opinion stated:

> <u>You have a neurologic illness</u> and are maintained on a ventilator. You have no medical needs requiring inpatient skilled care. **You are at a custodial level of care.** Per health plan guidelines, continued stay in the SNF is unproven to be helpful for your illness. **You can be cared for at a lower level-of-care.** The denial is upheld for continued SNF stay as of February 19, 2015. [Emphasis added] (Attachment B)

Dr. Stangel's opinion in the present UnitedHealthcare decision remains steadfast:

> <u>You asked for coverage for admission into a congregate living facility.</u>... You have are being maintained on a ventilator. Ventilator care does not, in its self, constitute skilled care. **We do not see that you have skilled medical needs. Residential treatment for your medical condition is not a covered benefit,** based on your health plan policy. The denial is upheld. [Emphasis added] (Attachment A)

This reversion to an unchanged overruled opinion at the second level undermines the purpose of UnitedHealthcare's obligation to provide an independent review of the medical justification asserted at the first appeal level.

Dr. Stangel demonstrated further willingness to confirm the Medical Director's findings in this decision. Dr. Green's determination in UHC Service Ref 2900[23] reintroduced the finding of custodial status by classifying Bridge 2 Life as a type of group home. That enabled Dr. Stangel to state that: "*Residential treatment for your medical condition is not a covered benefit.*"

Mr. Davidson's First Level and Second Level decisions were signed by Laura C., Appeals Coordinator. In the First Level appeal on February 26, 2015, (UHC Case ID 8001), Laura C. writes:

---

[23] UHC Service Ref 2900 signed by Angelique Green, MD, Medical Director, on April 2, 2015.

Dear Jonathan Davidson,

**We** reviewed your appeal regarding coverage of the services that you would like to receive from Reche Canyon Regional Rehab Center as requested by Jean-Claude Hage, MD. **We** understand the appeal to state that the requested coverage stay in the skilled nursing facility (SNF) should be reconsidered due to medical necessity. …During **our** review, **we** considered all the supporting information we have received to date….

**Our** prior payment decision for this service is therefore unchanged. [Emphasis added] (Attachment B)

In this Second Level appeal denial on April 10, 2015, Laura C. writes:

Dear Jonathan Davidson,

**We** reviewed the appeal filed on your behalf regarding coverage of the service(s) that you would like to receive from Bridge to Life Healthcare….

**We** understand the second appeal to state that the denied facility request should be reconsidered for coverage based on medical necessity and the level of care. During **our** review, **we** considered all the supporting information we have received to date.

**We** make decisions about payment based on your Benefit Plan and any information **we** receive as part of an appeal….

**Our** prior decision to deny this service(s) is therefore unchanged. [Emphasis Added] (Attachment A)

This dual level participation in the same insured's file is in clear violation of the standard set out in UHC Service Ref 4300 on February 12, 2015. In that letter, the Medical Director states that:

> **…The person who reviews your appeal will not be the person, or a subordinate of that person, who made the original decision.** [Emphasis Added] (Attachment C)

The fourth element in this April 10 decision letter is the labeling of UHC Case ID 8003 dated April 9 as the First Level appeal for the present case. As discussed in Finding 10, Dr. Greenberg left open the opportunity for a Second Level appeal to further show a continuing need for skilled nursing and that Bridge 2 Life is licensed to provide skilled care.

In this challenged April 10 decision, the Appeals Coordinator states that UHC Case ID 8003 decided April 9, 2015, was Mr. Davidson's First Level appeal. However, it incorrectly combines the two decisions by stating that this is the final Second Level appeal:

> Dear Jonathan Davidson:
>
> We reviewed the appeal filed on your behalf regarding coverage of the service(s) that you would like to receive from Bridge to Life Healthcare. <u>An **initial appeal** was reviewed and responded to on **April 9, 2015**. We understand **the second appeal** to state that the denied facility request should be reconsidered for coverage based on medical necessity and the level of care. ....</u>
>
> **Please be advised that a final appeal with UnitedHealthcare has been completed on the case.** [Emphasis added] (Attachment A)

It is reasonable to infer that this April 10 denial letter, in combination with the March 31, 2015, telephone directive by UHC to file a Second Level appeal, would lead to a conclusion that Mr. Davidson's remedies within UnitedHealthcare had been exhausted. Jonathan Davidson challenges the wrongful foreclosure of his right to full and fair review of adverse benefit determinations under proper internal appeal procedures, including his right to submit documents and information. Further, this Appeal Challenge document serves as well to present additional documents and information for Second Level appeal of UHC Case ID 8003, issued April 9, 2015.


**Finding 12: UnitedHealthcare management of the Hewlett-Packard Group Employee Welfare Benefit Plan has negatively impacted the physical and mental health of Jonathan Davidson and his family through decisions that continue to deny medically necessary skilled care at the Bridge 2 Life Congregate Living Health Facility.**

The impacts of UnitedHealthcare's continuous denial of coverage have negatively impacted Mr. Davidson's health. It has also affected the health and well-being of his wife. She had planned to return to work in April with confidence that her husband would have necessary care. Instead, she has had to reallocate her energy to this challenge to restore her husband's rightful coverage. The demands of this uphill battle have the added impact of diminishing family resources to unanticipated critical levels. The lost time and energy has deprived Jacob Davidson, age five, of parenting time during this extended period.

Beyond any stress-induced physical impacts of an often overwhelming challenge, this process has sapped vital mental energy. The assessment of Mr. Davidson's psychiatrist addresses direct medical impacts. The psychologist that primarily counsels his wife shares his observations based on experience with joint and individual assistance.

Cameron Johnson, MD, expresses concern for the impact of this appeal process on Mr. Davidson's mental health.

> I have been seeing Jonathan Davidson in my practice since early in his onset of ALS. Jonathan's diagnosis of bipolar depression, anxiety disorder, and symptoms of deficit is treated with balance of medications. My experience with ALS is that symptoms of depression and anxiety intensify with progression of the disease.
>
> I noticed significant change in affect when I saw him at the Reche Canyon Facility. He is now reliant on a communication device for expressing his thoughts. Jonathan has reported multiple incidents of panic attack coinciding with his oxygen saturation dropping below acceptable levels.
>
> I have concerns about the impacts of the stressors that recent events have placed on Jonathan. (Attachment V)

Corinna Davidson describes the devastating impact over months of consuming efforts:

> I would say that my husband's life energy has been focused on this appeal process. This is life energy he cannot reclaim. I also have spent the past five months consumed with research and effort to cope with and try to overcome this unnecessary and wasteful care denial and appeal process. (Attachment V)

Mrs. Davidson describes the impact of quality health care on Jonathan:

> I am aware that patients with ALS may die sooner than they would without that medical condition. What I also know, from nearly six years of daily experience with my husband's ALS illness, is that his life expectancy was based on the slow progression of ALS observed in the diagnostic tests. What I know for certain is that when Jonathan receives quality physical and behavioral medicine, he does well. I also know when Jonathan is doing well his healthcare expenses are low and his quality of life is high. (Attachment V)

Paul Gonsier, M.S.W., L.C.S.W., raises concerns about the impacts of the appeal process on Corinna Davidson:

> My greatest concern now is of the impact of the emotional trauma and stress Corinna has endured and continues to endure on a daily basis. I fear for the impact of the grieving process on Corinna's ability to function and recover. She has not made the progress one would expect to occur in a similar situation....Even now, one would expect Corinna would be spending time with her husband grieving and instead she and Jonathan are consumed with this appeal process and the impacts to their financial and personal resources. (Attachment W)

## Conclusion

### *Skilled nursing is a medical necessity for Jonathan Davidson.*

The threshold health coverage issue for Jonathan Davidson is whether his medical status demands skilled care. **Finding 1** defines ALS and its progressive loss of motor neurons leading to paralysis and death. Laura Nist, MD, describes how these symptoms have manifested since Mr. Davidson was affirmatively diagnosed in August 2009. Robert Bland, MD, FACP, FCCP, explains further the medical necessity for skilled care. As attending physician at Bridge 2 Life, Ancel Rogers, MD, confirms Mr. Davidson's continuing need for skilled nursing care.

### *Bridge 2 Life provides necessary skilled medical care to Jonathan Davidson.*

Finding Two and Finding Three affirm that Bridge 2 Life provides skilled medical care as a State-licensed Congregate Living Health Facility (CLHF). **Finding 2** explains that the California Health and Safety Code grants specific authority for CLHFs to provide care that meets or exceeds facility standards for skilled nursing. The California Department of Public Health exercises its same licensing authority for hospitals, skilled nursing and congregate living health facilities. **Finding 3** describes the level of care that Dr. Rogers and Mr. Davidson's respiratory therapist assess as better than at designated skilled nursing facilities.

### *The actions by medical professionals and UnitedHealthcare representatives have caused positive harm to Jonathan Davidson*

It is reasonable to infer that a Medical Director has ultimate managerial authority to determine whether particular care decisions are covered benefits. It is also reasonable to infer that a Medical Director may select physicians whose opinions align with a preferred outcome. A third inference is that a Medical Director may prefer an Appeals Coordinator more likely to sustain a Director's decisions.

The controlling decisions on Jonathan Davidson's coverage were set in motion by the Medical Director. Angelique Green, MD, signed both the initial step-down to custodial, and refusal to accept Bridge 2 Life as a skilled nursing facility. Peter Stangel, MD, sustained both Service References. **Finding 2** explains that the California Health and Safety Code grants specific authority for CLHFs to provide care that meets or exceeds facility standards for skilled nursing. The California Department of Public Health exercises its same licensing authority for skilled nursing and congregate living health facilities. Dr. Stangel repeated that denial at the Second Level, along with affirming Dr. Green's determination that Bridge 2 Life is a residential facility. Laura C., Appeals Coordinator, actively participated in both appeals.

Dr. Green's Service Reference on February 12, 2015, focused on the absence of therapy to help Mr. Davidson walk or swallow. **(Finding 4**, UHC Service Ref 4300) The Medical Director made no reference to his listed diagnosis of acute respiratory failure or ALS in determining that his medical needs were custodial. On appeal, Peter Stangel, MD, affirmed the Medical Director's clinical findings. **(Finding 5)** UHC Case ID K054171800) Dr. Stangel dismissed the opinion of Mr. Davidson's attending physician that he required skilled nursing care. Instead, he staked his medical opinion on the general premise that ventilator support can be managed at a custodial level of care.

Corinna Davidson heard that the request to designate Bridge 2 Life as a provider was denied during a phone call to the Appeals Department on March 31, 2015. On April 2, 2015, Angelique Green, Medical Director, issued UHC Service Ref 2900. It classified Bridge 2

Life as a type of group home, and therefore not a skilled care facility. (**Finding 9**)  However, in a discussion between Bridge 2 Life owner Lori Talley and a UHC representative, it was stated clearly that Bridge to Life is a Congregate Living Health Facility. (**Finding 9**).

The Second Level decision dated March 5, 2015 in UHC Case ID 1004 restored skilled nursing coverage through April 19, 2015, (**Finding7**) but was ignored by UHC's later improper attempts on April 9 and April 10 to deny skilled care. Corinna Davidson spoke with Amy, an Appeals Department supervisor on March 6, 2015, after learning that the decisions of the Medical Director and Dr. Stangel had been overturned.  She described her husband's negative experience at Reche Canyon, and the risks of moving again to another facility. The promise of an early resolution did not materialize. (**Finding 8**)

**Finding 11** is the clearest breach of the managerial trust placed in UnitedHealthcare by the Hewlett-Packard Group Employee Welfare Benefit Plan.  Mr. Davidson filed an appeal labeled as a Second Level appeal as directed by an Appeals representative to Corinna Davidson on March 31, 2015. (**Finding 6**)  It was faxed on April 7, 2015, and faxed again on April 9, 2015, after Mrs. Davidson was told that the document was not received.  When she called on April 10, 2015, to verify receipt, a decision had already been made. (**Finding 11**)

UHC Case ID 6004, signed by Laura C., Appeals Coordinator, on April 10, 2015, involved again Peter Stangel, MD. (**Finding 11**)  Despite an intervening opinion reinstating skilled nursing coverage through April 19, 2015 (UHC Case ID 1004, **Finding 7**)  Dr. Stangel reverted to his First Level opinion that Mr. Davidson's care status is custodial.

Beyond the fact that UHC Case ID 6004 should have been preempted by the March 5 decision in UHC Case ID 1004, **Finding 11** cites more dimensions of wrongfulness.  The first is the conflict of interest in recalling Peter Stangel, MD, to rule at Levels One and Two. UHC Case ID 6004 also claims that it is the Second Level final appeal of the April 9, 2015, decision letter in UHC Case ID 8003. In that decision, Edward Greenberg, MD, asserted a lack of information concerning a continued need for skilled care and certification of Bridge 2 Life as a State-licensed skilled nursing facility. (**Finding 10**)  UHC Case ID 8003 stated clearly that it had "*processed this correspondence as a First Level Appeal*." On the next day,

UHC Case ID 6004 declares it is the Second Level final decision by United Healthcare. This appeal and challenge by Mr. Davidson shows that this adverse benefit determination must be overturned and set aside, and Mr. Davidson must have an opportunity for full and fair review of any adverse determination regarding his continuing need for skilled nursing at a State-licensed Congregate Living Health Facility.

The decisions to step-down Jonathan Davidson from skilled nursing to Custodial can be explained simply as a cost saving strategy. The Davidsons understand the interest in reducing unnecessary medical costs. However, the mishandling of this case has deprived Jonathan Davidson of precious time that cannot be recovered.

He has survived six years since his ALS diagnosis in August 2009. This process has consumed the lives of Jonathan and Corinna Davidson since December 2014. Their son Jacob has lost precious parenting energy. The actions of medical professionals have caused positive harm.